Hear ye, hear ye, Mr. Honorable Appellate Court, where the Second Judicial District is now back in session. The Honorable Anne B. Jorgensen presides. Please be seated. Your Honor, the third case on the docket this morning is 2-22-0261. The people of the State of Illinois plaintiff Appellee v. Serafin Castellanos, defendant appellant. Argument will be kept with the appellant, Mr. Douglas H. Johnson. Argument will be kept with the appellee, Mr. Miles J. Cutler. Gentlemen, are you both ready to proceed? Yes. Counsel, then, when you're ready. May it please the Court. Counsel, my name is Doug Johnson. I represent the appellant, Serafin Castellanos, who is currently serving a life sentence pursuant to his conviction for double homicide. I'd like to address the first issue and issues surrounding the videotape that the police officers were allowed to opine to and identify the individual in the video as Serafin Castellanos. I believe that What's the standard? Abuse of discretion. No, I mean the standard for determining whether or not there should be, allow a different witness other than the jury just looking at the videotape. As far as the factors to be considered, the totality of the circumstances and the factors to be, from Thompson, the general familiarity of the police officer with the defendant, the familiarity of the police officers with the defendant at the time the video was taken, whether or not there is a suggestion or evidence that the defendant changed his appearance at the time of trial, whether he was wearing a disguise or the individual in the video is alleged to have worn a disguise, and the clarity of the video is looked at. And I will discuss those. I wanted to point out one, I think, very interesting and telling thing that happened in this case, and it's the pretrial testimony of Detective Moore. Detective Moore didn't have, couldn't claim to have any familiarity with Mr. Castellanos. Unlike Detective Shettles and Detective Villanueva, Detective Moore said, I didn't, he knew his name and he knew him from, quote, this case, but he claimed no other familiarity. Yet when he testified pretrial, I think they put him in because he talked about gathering the videos from the court and gathering the videos, but then they went one step further and they asked him, did you do a comparison of the court video, which had the known individual, everybody conceded, that's the defendant in the Aurora Court Ranch video. But they asked him, did you compare that to the unknown, they didn't say unknown, but the individual in the La Flama video, the shooter. And he said, yes, I did. And they said, were you able to, what was your conclusion? And he said that the man in court was, quote, substantially similar to the shooter. And he also said the man in court was wearing, quote, similar or the exact same clothing. And then it went on, again, Detective Moore pretrial, if you look at supplemental record 28 and 29, he basically said those are the same two individuals. Didn't he also say that it was difficult to see the facial features of the suspects in the La Flama video? He may, I don't have that in front of me, but he may have. However, if you look with regard to the clarity of the video, Shettles, for one, both pretrial and trial, said that it was good as far as what Shettles said about it pretrial. He said it was, quote, was actually pretty good because he walked underneath the streetlight around the corner so you could see his face. So the last point on Detective Moore, and I am unsure of what he said about it, but I think the bottom line for him is he was able to do it. He is in the same position as a juror. So if he can do it, why take this incredibly drastic, dangerous step with regard to the rights of the defendant and have police officers get up and say that's the shooter? Moore sat in exactly the same place as a juror, and I think that's why they didn't bring him back or they didn't make a comparison at trial because I think they understood. So you're speculating as to their decision, right? They already had several witnesses who identified the defendant, including Wallace. Well, getting into that, I think that there's a big difference between, one, even if she was not an accomplice, she did not come forward initially. She was found through the defendant's telephone records that were recovered in the accident some 10 months later, right? Correct. She was found, and she did not want to testify, understandably perhaps, but then she had to be granted immunity. So I think that's a far cry. But that was negotiated by her lawyer. When you say she had to be granted immunity, her lawyer negotiated that with the state, right? Yes. Yes, but I believe that when one has, under the circumstances of her, she is not the type, the jury would not look at her and say, I'm going to believe everything she says, but I submit to you these police officers, they are held in high regard correctly. And so if you have a police officer saying that's the person, that's a lot different than Miss Wallace or Bautista, another person that identified the defendant, he did not identify him initially, and then he got a deal. So I think these police officers were incredibly important to the case, and I think that's why, and this could be called speculation. I believe it's a reasonable inference. I believe that's why they brought them in, because they needed them to do this. And once they did. Well, first of all, Governor Huebo recognized the defendant the morning after the shooting when he was in the police department. He saw the video being played, and he said that's the defendant. That is the testimony, yes. But if we look at the factors from Thompson, I believe every single one of them weighs against admission of disidentification, general familiarity of the defendant, how he looked in high school. Even if we believe this, I mean, we're talking about how he looked in the high school locker room, how he looked while the young man was riding his big wheel. We're talking about decades earlier. Both Villanueva and Shettles knew the defendant from high school. Well, yes, they said. Knew his appearance. Knew how he walked. They said, yes, they knew his appearance as far as he was a big guy. Recognized his gait, the way he walked. Well, for one who has a gait, I don't. You can see that. You can see. But this is not like that. You can see him walking the video. We've watched the video. You can see his walk. And they said when asked over and over again what was distinctive about it, the answer was always he's a big guy. He walks with confidence. Something like that. They were completely consistent. But the jury can see that. Isn't that only for the trial court to look at those nuances? I think so, but I think in this case. How do they re-weigh that? But additionally, didn't both, is it Shettles and Villanueva, both said that they had seen the defendant around town at crime scenes. I'm not going to have this exactly correct. And gang boards, et cetera. So it wasn't that they had only seen them when they were riding their big wheel. I think that they. They had seen him more recently as well. The only recent, pinpointed recent time was when. Pinpointed. But both of them said they had seen his photographs, seen him on gang boards. Did they not? I think they were talking about gang boards pre-trial, absolutely. But not visualizing this man. They talked about his appearance from back in the 90s and mid-90s. The one incident, which is our third issue, but certainly related to what we're talking about, they said one of the officers said, he flipped me the bird in 2017. That was Villanueva, wasn't it? I believe so. So Villanueva said. So that, certainly that is not stale. If the ability to recognize someone that you were in school with becomes stale, certainly Villanueva's ability to recognize was not stale. I believe it absolutely was, respectfully. What we're talking about. Even with this alleged bird incident. Yes. Because he, let's look at this. They testified that the idea was he's a big guy. Okay. You can't, this is the defendant driving by in a car. So. Their identification was also, and again, I don't know if you recognize this, but their identification of the defendant was kind of supplemented by the courthouse video, the branch court video, the clothing the defendant was wearing, how he walked in that video, and he signed, I mean, he was, and it was not contested. I think it was stipulated to write the foundation for the courthouse video. Absolutely. So they know that's, that is the defendant. And then they're looking at that same video. And your argument is the jury could have done that themselves, right? Yes, Your Honor. And let me ask you this. How is their, the testimony of the two officers, Shadows and Villanueva, how is it prejudicial in light of Wallace's identification, the courthouse video, and the cell phone records, and the location records that basically document the defendant's whereabouts from the entire day up to and including the shooting and then going back to his house? I'll try to address everything in that question. The, Wallace, again, I think comes with a bias. She was, I don't know if the court will decide she was an accomplice, but she was involved in this.  But she didn't see the shooting, but everything after that, she sees the defendant and Patton get out of the car. She doesn't see the shooting itself, but everything's captured on video. Well, there's a video, but I thought we were talking about her supplementing. I was talking about the officers earlier, but I'm talking about Wallace's testimony is corroborated by the cell phone data, the location testimony of the expert, correct? No. That's not? That's not corroboration? I believe the cell phone data is junk science. A lot of it is not in the record here, but I believe that was, if you look at People's Exhibit 103, which is the video, this gentleman who came in, I think he had a degree in forestry, and he comes in, and he, if you look at what is done with this demonstration, it's a series of circles and pings. The dates and times of these pings are not all labeled. There is a ping that doesn't make, like we often see in these cases, there's a ping that is not consistent. Also, we all agree, and this is what the state always does, which I suppose points out, we're not pinpointing his location. We're just saying the general area. But I submit to you what happened with this cell phone is if you really look at it. Was that preserved in the post-trial motion, this objection you're making now? There were, I believe in the post, well, I'm explaining the value and the weight of the cell phone evidence, but I don't, the post-trial motion, I believe, I'm not positive, as I sit here today, whether or not they got that specific, but I believe they did deem the cell phone in the post-trial junk signs that should not have been admitted. And also there is our issue, it's our fourth issue that I raised, talking about how this was an inadmissible hearsay because the AT&T phone records were not admissible and were not admitted properly under the business records exception. And again, that was preserved? That specific was not preserved. We argued plain error. I have the motion here. What paragraph does the defendant allege that it should not have come in as quote-unquote junk science? My recollection was that they argued at some point. I think it's in 8 and 9. At least the junk science is used in paragraphs 8 and 9. That was what I recalled. The geolocation expert was confusing, misleading, and in the end conceded it was not precise, and therefore it was a junk science. That's what I was referring to. And so I don't think, so the police officers, it was game over, I believe, that we're talking about was this reversible error. I mean, we talk about how Moore could identify, could do it in the place of a juror. You talk, Your Honor, about how they could look at that court video themselves and say that's the same clothing or that's not the same clothing. The juror could do that. And you talk about invading the privacy of the jury. And then they didn't give the proper directives. They didn't say, okay, before we now listen to this first officer, give his opinion, we have to follow the mandates of the law and give you the instruction. They didn't do that. They did it later. They did it before and after the second officer and then again in the final instructions. Yep, they just didn't do it the first time. So the first time the jury heard this, they heard a police officer with no limitations get up and say that's the guy. And then also in the way they testified, basically their testimony wasn't brutal. And when you talk about getting back to the flipping of the bird, I mean, this is worse than another crime. The state said, well, that's maybe not even a crime. I submit to you. Go ahead. I submit to you that it's worse than a crime. I think a lot of the juries may have had, could have committed crimes. A lot of crimes are committed, as your Honor knows. Retail, many, but I bet you none of them had flipped off a cop. Who does that? That's incredibly prejudicial, especially getting back to what the identification was because it was the only one that was allegedly recent, was he's driving by. It happens for a second, but he's not walking. So this distinctive walk that he seems to have, that's not seen. So we have to go back. Not to mention Pubert, I mean, we don't even know. But again, aren't you asking us to re-weigh facts? I think to analyze the facts and see whether the discretion was abused because now to look at the factors in Thompson and to say do these apply and was this admissible? Getting back to Harmless Aaron, I think that we're asking now if there was nothing else but these two detectives to get in and say that's Castellanos, he's a big guy, and he's kind of a brute in high school. Given that the court gave the instruction three times, is there any reason to think that the jury wouldn't have followed the protective instruction from Thompson? I think the reason is if we look at the case law from Stitz where they say, no, these are mandatory directives. It has to be done. We're going to allow this. These are mandatory directives. There's a reason for that. Well, in Stitz there were no directives given. Zero, right? Yes, that's what I'm saying. I can see here that it was just the one time. And the Supreme Court obviously did say in Thompson they should have been given before the officer. Yes. And then we see that these are mandatory because I think it sees how serious this violation was because if you have two police officers with nothing else saying that's your guy, he's going to be found guilty because the jury isn't going to sit in there and go, you know what, we think they're lying. In your opening brief you cited to this supplemental record page 21 of Moore's testimony and said that that was actually presented to the jury. You acknowledge in your reply brief. Absolutely. Did you know that when you wrote the brief? You must have known when you wrote the brief Moore's testimony was from the pretrial hearing. Absolutely not, Your Honor. It was a mistake, and I believe I conceded that in my reply brief. In your reply brief you just acknowledged that that was wrong. And it was. Any other questions? You will have a time for reply. Thank you. Counsel, do you wish to respond? Yes. Good morning, Your Honors, Counsel. Miles Kelleher on behalf of the people. May it please the Court. The trial court properly allowed the two officers to identify defendant in the La Fama surveillance video. Prior to trial, the court conducted a hearing and gave the defense an opportunity to examine the witnesses in accordance with the Supreme Court's decision in Thompson. Officer Villanueva and Detective Shettles both testified about how they were familiar with defendant's appearance. They had both attended high school with defendant. They saw him in the hallways practically on a daily basis. Detective Shettles was in the same physical ed class with defendant. He could observe defendant's appearance, his big, broad shoulders, his round head. Same with Officer Villanueva. Officer Villanueva even knew defendant earlier as a child. He lived next door to his cousin, Tito, and when defendant was out on his driveway riding his bike, he would see, I'm sorry, when Officer Villanueva was out on the driveway, he would see defendant next door at Tito's house. Let me ask you this. Without seeing the video from the courthouse, do you think either one of those officers would have been able to say, oh, that's the defendant? I mean, we've all watched the video. Is it clear enough to say, oh, that's Mr. Castellanos? And is it fair game to look at that video, the courthouse video, which they know that's the defendant because he's signed in. He appeared for a court appearance. Is that fair game for an officer to look at that and then say, this is the defendant? They testified that they looked at the La Farma video and almost instantly recognized defendant. And it's not even clear if they had seen the courthouse video prior to that. But I would contend that even if they hadn't seen that courthouse video, just looking at the surveillance video from La Farma itself, because you can see the defendant's body structure, and at one point you can see the defendant's face, and these are two officers that were highly familiar with him, had seen him countless times in the past. So when they saw that La Farma video, it's like, there's Bino. That was his nickname. And they immediately told the other officers that they recognized the person in that video as defendant. And not only in the video, but the person actually firing the gun. So here, there were two criteria in Thompson that were satisfied here. The officer's identification testimony was rationally based on their own perception. And in other words, they weren't basing it on someone else's identification of defendant. They were basing it on their own perception because they knew what defendant looked like. So they were using their own personal knowledge, based on countless times seeing defendant in the past, as a child, in high school, even sometimes as their work as a police officer. They saw that La Farma video, and it's, that's defendant. That's defendant Serafin Castellano, or Bino. May I ask, why should we excuse the failure of the trial court to provide the protective instruction before, was it Villanueva's testimony? Or was the first police officer to present this? Yes, it was Officer Villanueva. He testified. Why should we excuse them? Well, he testified later in the afternoon. The trial court did not provide the instruction in question. However, the following morning, the trial court. The question is, why should we excuse the failure to do it the first time? Because the trial court subsequently cured the error. Immediately the next morning, the trial court. How do we know that? I mean, the first police officer who testifies without any instruction, without any barrier, without any caution, isn't that sort of closing the door after the horse is out of the barn? No, Your Honor, because the errors can be cured. And this is a case where immediately upon realizing the error the following morning, the trial court gave the proper instruction to the jury. And then Detective Shettles testified at trial, and the court properly gave the instruction prior to his testimony. So that's the second time the jury heard that instruction. And then at the close of evidence prior to the jury deliberating, the trial court gave the instruction again. So that was the third time the jury was given that instruction. And they were also given a written copy of the instruction to bring back to the jury room. So we have a situation here. Yes, we acknowledge an error did occur, just in the timing. Was that error preserved? No, Your Honor. They're seeking to have this issue reviewed under the harmless error doctrine. I'm sorry, the plain error doctrine. In plain error, they argued the evidence was closely balanced. Was the evidence closely balanced? Not at all, Your Honor. This is a case where the private stipulated to the Aurora Branch Court video, which showed that defendants earlier in the day had been to the Aurora Branch Court, and the video at the Aurora Branch Court clearly shows what he's wearing, the clothing, the black jacket, the red shirt hanging down, the black cap. It also shows his body build, his facial composition. It shows his gait. And when you compare that with the Laflamma video, it's very clear that this is the same person, identical body build, identical clothing. Which brings back the defendant's objection to the officer's testifying. It was unnecessary, given Wallace's testimony, given the cell phone data and the courthouse video. When you compare the two, it was obvious that it was the defendant. This is a case where there was ample evidence, but just because you have an abundance of other evidence doesn't mean that you can't follow the guidelines in Thompson and present. I mean, some cases are slam dunks where there's just an abundance of evidence. I submit this was one of them. But just because you have a wealth of other evidence, such as Alexis Wallace's testimony that he was at the scene, the Aurora Branch Court video, that doesn't preclude the state from presenting additional evidence. And this happened to be a case, a unique case, where the officers were just so familiar with this defendant from their past, their high school, even their childhood, one of them. And just because there's an abundance of other evidence doesn't preclude the state from presenting additional evidence that was helpful to the jury. And it concorded with the guidelines set forth by the Illinois Supreme Court in Thompson. It was helpful to determine a factual issue, and that was the identification of the person depicted in the LaFlamma video shooting the gun at the three victims. As far as the question about the officer Willa Norello giving the middle finger, that evidence was shown simply to show that in addition to his familiarity with the defendant growing up and going to high school, he was familiar with the defendant's appearance as recently as 2017, the year of this incident. And if you think of it, say he had just testified, well, I was out on the street assisting other officers, and I saw a car go by, and I saw a defendant in that car. I know it was a defendant. So the jury might say, well, you know, what kind of view did he get? You know, how familiar is he? But the fact that he described the situation, you know, defendant flipping the finger.  Yes, exactly, Your Honor. They made face-to-face contact, eye contact, and, you know, that's a memorable event. And that officer, Willa Norello, knew that that was defendant. And I said that it may have been a disrespectful act, but it didn't rise to the level of other crimes or other acts. Other crimes' evidence requires, you know, misconduct or criminal acts. And I would just note that it's significant. What did Willa Norello do when defendant did that? He did nothing. He didn't go after him. He didn't arrest him. He didn't request that defendant be charged because it wasn't a criminal act. It wasn't. It might have been a disrespectful act, but that was it. But it did show that Officer Willa Norello was familiar with defendant's appearance, recognized his face, as recently as 2017. So when Officer Willa Norello looked at that video, the Flama video, he knew right away, that's Bino. And I don't believe he had even looked at the video from the Aurora Branch Court at that time. He had just walked into the police department that morning when they were watching the video. Yes. You know, the officers are looking around. There had just been a double murder, and it's like, hey, you know, obviously they're trying to see if anyone can identify who's in the video. And it just so happened that you had two officers who went to high school with the guy, with defendant. As far as Michael Flagley's testimony, the issue was whether an expert can rely on these records. It wasn't whether these records were improperly admitted into evidence. And there's a wealth of case law showing that, explaining that an expert witness can rely on evidence that might not otherwise be admissible if it forms the basis of his or her opinion. And if it's reasonably relied upon by experts in that field, right? Yes, Your Honor. And if that testimony wasn't there, should the trial court have let it in? Is that an answer? Well, Your Honor, in this case, I think we can apply common sense and reasonable inferences. If an expert is testifying in the area of historical cell site analysis, obviously the expert is talking about the data that's coming in and out of that cell site. The whole purpose of the cell site is to communicate with cell phones. And it keeps a computer record of which phones it's communicating with at any given point in time. And that's what he used as the basis to do his analysis. Take this data from AT&T that was indicating which cell phones was the cell tower communicating with at any given point. And it was able to, you know, use a computer program and Google Earth and essentially determine that at a particular time, defendant's cell phone was within this geographical area. And it matched perfectly with the version of events that Alexis had given and him being at the courthouse, at Petney's. So your point is that we just do away with foundational questions because we can infer it away. Is that basically your response? No, Your Honor. The issue here is whether... Whether these records are the kind that are generally relied upon by experts when formulating the opinion that was testified to. So how do we know that these records are, in fact, the kind that are supposed to be relied on? Do they have a defect? Is there a problem with AT&T records? Isn't that why we have foundation questions? I understand the concern, Your Honor. However, in this case, it was so obvious that this was... These AT&T records were directly related to the information coming in and out of the cell tower. And Officer Feigman explained his method, the methods he used to analyze this data. The objection was this is junk science, correct? That was the objection, but this type of data is relied on by courts, you know, extremely frequently. And it's becoming more frequent because this is a common... You know, practically everyone has a cell phone now. So they may or may not know that, you know, the towers are tracking them, but that's the reality. And I would just point out, if this court does find an error, I submit no error occurred regarding Officer Feigman's testimony, but even if it did, it amounts to a harmless error or under a plain error analysis, this case wasn't closely balanced because Michael Feigman, he acknowledged that this testimony, this data, it was helpful, but it didn't pinpoint defendant's exact location. So there was a wealth of other evidence indicating that defendant was right at the scene, and especially Alexis Wallace's testimony and the videos themselves and those who identified defendant on the videos. Any other questions? Any other questions? No. Thank you very much for your argument. Okay. Just based on all these reasons, as well as those in our brief, the people respectfully requested this Court affirm defendant's convictions. Thank you. Thank you. Do you wish to reply? Yes, Your Honor. Okay. First I'd like to point out that the test for admission of these lay opinions by the officers isn't were they sure. In their opinion, were they very confident it was him? That isn't the test. And I think through some of the presentation, it became clear as counsel was speaking that the point is, he said, the video, the court video shows everything. It's very detailed, et cetera, et cetera. And then he went into the final video and said, identical body build. That is exactly what the jury could assess for themselves. So we know that the video was clear. The police officers admitted it. And the jury could have made this comparison that the Thompson factors are what the test is. And I submit, as I said, none of them suggest the opinion should have been admissible. In fact, I think this was extremely confusing to the juror because if I'm sitting on a jury, I'm thinking, why are they telling me all about how he looked in high school and as a 10-year-old? Why are they telling me how he looked when he came over to see his friend? I mean, I can see him in that court video within 24 hours of the shooting. They're telling me that's him. That's how he looks. That's how he looks on video. So I can make that decision. I can also see him in court. Why do I need to know that he walked around a school of almost 3,000 kids looking cocky and big with a round face? That was very confusing, and I submit, respectfully, completely irrelevant. And so for those reasons, I think it was completely inadmissible. And I don't think, with regard to the second issue, it was close enough when they said, well, we didn't give it. Counsel said, well, they immediately the next morning they gave the instruction, but not the first time. Hard to unring that bell. First impression, and it wasn't immediate. They got to sleep on it. Curative instructions are very common. They are, but how common is it for the court to say, with regard to this specific issue, because it is so delicate, these directives are mandatory? So I think with that added case law, it puts us in a better position. In your briefs, you characterize the evidence as closely balanced. What is closely balanced? I think we've hit on what they say. The state says is the evidence, and we go a lot to Ms. Wallace, and we've discussed that. I just think that is a witness that comes with a lot of baggage. Well, when we look at closely balanced, we don't. We look at the entire record, correct? Yes, Your Honor. And in determining whether or not the evidence is close, we conduct a qualitative, common sense assessment. And courts have explained, our Supreme Court in Chevy and this court in Ola, we explain that where there's two credible versions, and neither are supported by extrinsic evidence or, in other words, corroborated, then that version is closely balanced. That's closely balanced. And here, clearly, Wallace's testimony is corroborated by extrinsic evidence, correct? It's hard to answer that question. By other witnesses, Batista, the officer's testimony, the courthouse video is corroborative. Would you agree that it is corroborative of the defendant's appearance that day? Of the court? I mean, it's corroborative of what he wore to court. I don't know how he corroborates Wallace's testimony. There's no evidence that supports the identification of the defendant. I respectfully disagree. I think this evidence, Batista is a gentleman who said he saw, when I first saw the video and I saw that individual walking, I thought it was someone else. Then he gets a deal, and then he says that's the defendant. So how that corroborates, I don't think that corroborates anything. And the same type of baggage as Wallace, there's no forensic evidence. There doesn't have to be. I understand that. But there's no forensics. There's no physical evidence. There's no statements whatsoever. They didn't arrest him for a year. I think that shows. And I would also say, and Your Honor may call this speculation, but I think it's reasonable inference. These are the top prosecutors in this county. They know what they're doing. And I think they looked at their case, and they thought, again, I believe a reasonable inference. We need more. And they took more, and they did it with the police officers. So the fact that the prosecutors were patient demonstrates what? I'm not criticizing. It demonstrates care. They're bringing charges, right? Yes, but I think it also, can we look at it and say, they looked at that video, and they're so sure immediately that's the defendant, why does he see out for a year? How about the defendant's, his Facebook post saying where he was, that he was at Pepe's when Wallace Fessy was? That's an evidence that is not. How is that not corroborative of Wallace's testimony? Wallace's, I guess it's corroborative of Wallace's testimony that they were there prior to the shooting. If there are no more questions, do you have anything to say? No. I don't either. Thank you, Your Honor. Thank you both for your arguments this morning. We will be in recess the balance of the morning and reconvene for our next argument.